Good morning, ladies and gentlemen. The first case on the docket this morning is Zahn v. North American Power & Gas. Mr. Blankenship. May it please the Court, and good morning, Your Honors. My name is Greg Blankenship. I'm with the law firm of Finkelstein, Blankenship, Frey, Pearson, and Garber, and I represent the plaintiff appellant, Ms. Zahn. We identified three issues on appeal today, and with the Court's indulgence, I'll start with the first one, which is whether or not the Illinois Commerce Commission or the ICC enjoys exclusive jurisdiction over plaintiff's claims. I would start with the unassailable point of Illinois law, which is that Illinois courts have original jurisdiction over all justiciable matters, but if the legislature wants to make an exception to that, it must do so explicitly, and employers' mutual company v. skilling is directly on point. There, the Illinois Supreme Court addressed the question of whether the industrial commission had exclusive jurisdiction over all issues regarding the application of the workers' compensation law. Now, that statute provides that all- That's a different context, counsel, and the about speaking with clarity for purposes of ICC jurisdiction over electricity rate issues? Your Honor- In other words, they allow an implicit exclusivity, for lack of a better way to put it, rather than explicit exclusivity? Well, Your Honor, I think I would respectfully suggest that skilling is still a good law. Well, it's still good law, but it's in a different context, a different regulatory context. The Supreme Court of Illinois has spoken very clearly in the Scheffler case, which is in the electricity rate dispute context, and said very clearly that the ICC does have exclusive jurisdiction. Well, Your Honor, I would suggest that Scheffler and skilling are entirely consistent, because in Scheffler, the question was whether or not the ICC had exclusive jurisdiction over claims for rate reparations against a utility, against a public utility. Now, the Public Utility Act does contain an explicit grant of exclusive jurisdiction for public utilities to hear claims of reparations, but that is a separate context from independent energy companies, or as the legislature refers to them as ARIES, or A-R-E-S. Scheffler was only about public utilities, and that case didn't address whether or not an ARIES was, in fact, separate. And if we look at both the Public Utility Act and the rate relief law, I would suggest that the legislature made clear that ARIES were not to be treated as public utilities. Scheffler involved a claim against- Well, didn't ARIES section 16-102 define an electric utility as a public utility? Yes, Your Honor, but an ARIES, but the rate relief law also defines an ARIES as not being an electric utility. And more significantly, when the rate relief law was passed in 1997, the legislature amended the Public Utility Act definitions to specify that an ARIES is not a public utility. So by explicit definition, when they amended the rate relief law, the legislature set out to remove ARIES from the broad reach of the ICC's authority over public utilities. And we can see that simply by the difference in the way in which the legislature granted authority to the ICC to hear those claims. In the Public Utility Act, under section 9-252, the language couldn't be more clear that if there's a claim that a utility charged rates above, or excessive rates, or rates above the filed rate or the tariff, then the ICC has exclusive jurisdiction, and that language is plain. On the other hand, the rate relief law contains no such clear statement that the ICC has authority to grant reparations. So are you saying there's concurrent jurisdiction? Exactly right, Your Honor. That's exactly my point. Well then, if there's concurrent, who has primary jurisdiction then? Well, Your Honor. Or who should have it? Your Honor, the ICC does not have primary jurisdiction. And the reason being that this is the question of whether or not a rate provided by a private entity in a private contract is above or below the rate was actually provided. This is standard fare for courts. In this case, all that the court would have to do is compare the rate that North America Power actually charged versus the rate that they did charge, I'm sorry, the rate that they should have charged versus the rate they did charge. Or more simply, they can simply compare the rate that North American Power charged versus the rate that the public utilities charged. Because Ms. Zahn alleged that she would not have switched from the public utility to North American Power, but for North American Power's deceptive misrepresentations. And so it's just a simple matter of comparing, from a damages perspective, what the utility rate is versus what North American Power's rate is. And courts do this all the time. They determine what charges should have been under a contract and what charges were actually charged, and they figure out the difference. On the other hand, the Illinois Commerce Commission does not have the expertise to determine what a market rate should have been. And that was the reason why the legislature passed the rate relief law in the first place. When the ICC is addressing what a just and reasonable rate should be for a public utility, the question there is balancing, and this is all explained in Shuffler, the question is balancing on the one hand, the cost that the utility incurs for providing electricity versus the cost that the least economically advantaged Illinois citizen can afford. And that's a public policy decision. But in 1997, the Illinois Commerce Commission determined that a much better way to set utility rates would be to allow the market to set those rates, and essentially determining that the ICC did not have the competence or authority to determine what those market rates were. And that's why, under the rate relief law... Where in the law is this lack of confidence expressed? Well, Your Honor, I would suggest that in the... The ICC certainly has expertise over the electricity market. That's explicit in the text of the law. That they take the public interest and disadvantaged consumers into account in setting rates according to its statutory mandate doesn't mean it has no expertise in evaluating the electricity market. Your Honor, I think... That's an extraordinary statement. Your Honor, I would... I apologize if I overstepped. My point only is that, as Your Honor just noted, the Illinois Commerce Commission has expertise in determining electricity rates for the public benefit. And that's not just a question of figuring out what market rates should be. Right. But the commission clearly takes the electricity market into account in determining what's an appropriate or just fair rate when it approves public utility rates. Well, the ICC certainly takes into account the cost that the utilities have to incur. And to the extent that the market is comprised of economically disadvantaged citizens, then that is something that they consider. But the rate relief law explicitly removes from the ICC's authority the ability to set the rates. They don't have to... The utilities... Sorry, the ARIES don't have to file their rates with the commission. Those rates don't have to be approved. And the reason being that the legislature wanted competitive forces to determine those rates. Well, counsel, doesn't 16.115B of the rate relief law specifically state the ICC has jurisdiction over ARIES with regards to consumer complaints? And if it fails to provide service in accordance with the terms of a contract? And if so, how does your client's claim fall outside that provision? Your Honor, again, that goes back to the point of there being concurrent jurisdiction. Our plaintiff could have brought a claim under 115B subsection A, because Your Honor is of course right that the Illinois Commerce Commission can entertain and dispose of complaints. And that does include the claim that the ARIES is not complying with a customer agreement. But that authority is explicitly circumscribed by 115B subsection B, in which the authority of the ICC to grant a remedy is explicitly limited. Subsection B1, for example, provides that the ICC can only... or correct violations of section 115 or 115A. But those sections don't get at rate relief questions, those are just injunctive orders. So for example, Ms. Zahn could have complained to the ICC that North American Power failed to disclose that it was going to charge exorbitant profits. But the ICC couldn't then order reparations, it could only make North American Power change its contract. Similarly, subsection B2 provides that the ICC can provide financial penalties. But financial penalties under subsection 5 slash 4203D of the PUP Utility Act are not something that goes to the plaintiff, they're not reparations, they're financial penalties that go to the Treasury. And subsection B3 only provides that the ICC can alter or suspend certification of the ARIES, not reparations. And, Your Honors, I would suggest this is a fairly simple question of statutory construction. When the legislature provided authority to the ICC to order reparations for excessive rates against public utilities, it did so in clear and express language. And that's subsection 9-252. But the rate relief law only provides that certain sections of the PUP Utility Act apply, and subsection 9 is not part of that. When the legislature provided the authority of the ICC to hear and dispose of claims, it did not use the simple language it used in section 252. It did not say, it would have been very simple to have just said, a consumer can obtain reparations from the ICC. But they didn't do that. Instead- Well, the commission thinks it has jurisdiction over claims like this, contract claims. I wouldn't disagree, Your Honor. Again, it's concurrent jurisdiction. And I think the case Your Honor might be referring to is the Chiku case, which is cited by the SRT Enterprises Court, which both the defendant and the district court relied upon. In those cases, in Chiku, the plaintiff actually went to the ICC and there, and filed the claim with the ICC. And there, the ICC said, yes, we have jurisdiction to hear this claim. And we're not contending that plaintiff couldn't have brought a claim also before the ICC. But the ICC could never provide her with the relief that she asked for. And in Chiku Enterprises, we don't see the ICC awarding affirmative- Well, right, because it wasn't a final order. That was an interim motion to dismiss, as I understand the procedural context. And the commission rejected the jurisdictional argument. And I don't know how the merits came out, but the implicit in the decision is that the commission thinks it has the authority to deal with contract disputes and provide a remedy. Well, Your Honor, I would- Or including a compensatory remedy, which I think is your point, right? Your point is that there's injunctive remedies and other things, but not a compensatory remedy. That's exactly my point, Your Honor. And that issue is not addressed in the Chiku case. You're right, it was- But it's implicit, because it was a claim of an overcharge, right? It is a claim of an overcharge. I would respectfully disagree that it is implicit. Now, perhaps the reason it's not addressed is that the defendant didn't raise that issue. Perhaps the ICC felt like it could address that issue later. It's unclear from that decision. But what is clear from the Chiku decision is that it does not explicitly state that the ICC can provide a reparations remedy, and it does not provide that it's exclusive jurisdiction. Neither one of those cases are addressed in Chiku. And in fact, the question of whether or not exclusive jurisdiction lies isn't just because there are some remedies available, it's not something that's addressed in the SRT Enterprises case. There, the courts simply jump from the conclusion that the ICC could have heard the claim to the conclusion that only the ICC could have heard the claim. But that's not the law in Illinois. That hasn't been- From 1992, when the Illinois Supreme Court passed NL Industries, to again a couple years later, where the court couldn't have been more clear that there has to be an explicit grant of exclusive jurisdiction. And I appreciate Your Honor's point that Scheffler may indicate otherwise. But again, I would suggest that Scheffler is limited to public utilities, and the Public Utility Act, which does provide for explicit jurisdiction, and that's in, again, Section 9-252, and also in 9-201, where the legislature limited the court's authority in relation to claims against public utilities to civil damages, as opposed to reparations. Right. But the legislature, in creating this new category of electricity providers, seemed to indicate an intent to treat them as public utilities for many purposes, but just not for rate setting. Right? I mean, is that a fair construction of the purpose of the reform? It's not fully deregulatory, as you're suggesting in your briefs, or implicitly suggesting in your briefs.  It is, Your Honor. And I wouldn't disagree with that point. I would only say that it's a standard principle and canon of interpretation that when courts say one thing and not another in statutes that are part of the same act, that they mean something different. If the legislature had wanted the Illinois Commerce Commission to have exclusive jurisdiction over reparations claims, it could have simply said, Section 9-252 also applies to ARIES. It didn't do that. It only specified, with great specificity, those parts of the Public Utility Act that do and don't apply. For example, they pointed to sections in 801, which concern things like not cutting off electricity in the winter to disadvantaged people. There are parts that they said do apply. The parts that they didn't say apply, therefore, don't. In order to find that the ICC has the authority to order reparations here, the court will have to pick and choose between parts of the rate relief law which are not explicit. And ultimately, that's the conclusion I'd— Mr. Blankenship, do you see any harm if we ask the Illinois Supreme Court to take a look at this? Your Honor, I would suggest that would be appropriate. I do think we've made our case that the law is clear, but this is a question of first impression for—under Illinois law, and I would suggest it would be entirely appropriate for the Illinois Supreme Court to hear this, and we would be supportive of that position. I see I'm well into my rebuttal time. If there are any other questions, otherwise, I'd like to reserve what I have. Thank you. Thank you, Your Honor. Mr. Kappas? I'd ask you the same question with regard to certification. We would have no objection, Your Honor. May it please the court, Angelo Kappas on behalf of North American Power and Gas, LLC. The district court's decision to grant the motion to dismiss on both the 12B1 and 12B6 grounds must be affirmed here. Since this is a dispute alleging excessive electricity rates between an alternative retail electric supplier and its customer, the Illinois Commerce Commission has exclusive jurisdiction here for two reasons. One, there are several specific statutory provisions calling for such jurisdiction, and two, the ICC has an interest in regulating both ARESs and public utilities alike based on the Public Utilities Act. As for the 12B6 argument, the decision by the district court should also be affirmed there because the contract attached to the complaint proves that Zahn has no right to relief. Moving to my first point, we were successful at the lower court and should be affirmed here because two specific sections of the Public Utilities Act mandate ICC jurisdiction, and those are section 9-252 and 16-115B. Zahn cannot escape that section 16-115B governs this dispute, especially as to whether or not an ARES adequately disclosed its prices and terms of service in its contracts, which is exactly what Zahn is complaining of here today. Counsel, do you believe there is concurrent jurisdiction or just exclusive jurisdiction? Both, Your Honor. We believe that section 16-115B and 9-252 give exclusive jurisdiction. Even if there was concurrent jurisdiction, primary jurisdiction would rest with the ICC because the ICC has expertise in governing over issues concerning the reasonableness of rates as well as the categories outlined in section 16-115B. Is it your position that the PUA applies, that all the articles of the Public Utilities Act applies to ARES in the article? The Rate Relief Act, specifically section 16-101, has inclusionary language that allows all other provisions of the Public Utilities Act that apply to a public utility also to apply to an ARES when dealing with tariff services. Well, why does the Rate Relief Act set ICC oversight over ARES separately if you think that the entire article is applied to it? Why separate them out? The Rate Relief Act was enacted in 1997, well after the portions of Article 9 were set forth of the Public Utilities Act governing ICC jurisdiction as Zahn concedes in section 9-252. So instead of rewriting every single article to add public utility and ARES where it applies, what the legislature did was add specific sections, for example, in the telecommunication cases that Zahn cites in the brief. Those sections in Article 13 state inclusionary language but only list certain sections that will apply. Here, the Rate Relief Act does have inclusionary language that allows the entire Public Utilities Act to apply when dealing with tariff services. Tariff services are nothing more than the providing of electricity to the Illinois customer and that is exactly what NAPG was doing here for Ms. Zahn and other Illinois customers. When looking at whether or not a customer chooses an ARES over a public utility, they are provided one bill. Based on the Rate Relief Act, there's a single billing option and ComEd, in this case, handles that procedure. As part of the accounting and billing services that ComEd performs, it charges back to the ARES overhead for those accounting and billing services as well as use of delivery of the electricity across its infrastructure to the ARES. So the ARES has to contemplate part of that filed tariff rate from ComEd for those overhead services and use of delivery lines back to the customer. But its own rates aren't subject to approval by the Commission? No. The ICC, Your Honor, as you state, does not regulate specifically the rates, but it has other suggestions as to how it makes an ARES comply, specifically Section 16-115 through 115A sets forth a laundry list of requirements that an ARES must comply with before it is allowed to service an Illinois customer and those include adequately disclosing prices in terms of service in its contract and marketing materials, which is exactly what Zahn is complaining of here today. Right, but that section doesn't explicitly incorporate the remedies provision in 252. It does not. But under Section 16-115B, allowing the Commission and stating that the Commission shall have jurisdiction to entertain and dispose of complaints between an ARES and its customer, the use of the word shall by the legislature has been held by the Supreme Court to be one of mandatory. Well, right, but the plaintiff's argument is not that the ICC doesn't have any jurisdiction at all. It's that it's concurrent. In other words, the Rape Relief Act didn't divest the circuit courts of original jurisdiction over actions of this sort. It just created concurrent jurisdiction in the agency as well as the circuit courts. The exclusionary language that we would submit to this Court as existing is in looking at Section 16-115B, where it states that the Commission shall have jurisdiction in accordance with Article 10. Looking at Article 10, Article 10 sets forth the procedure of the ICC to first and foremost hear these cases and dispose of them and determining whether or not a customer is entitled to Rape Relief. Article 10 has that exclusionary language because it then states that this Court or the Illinois Appellate Court only has jurisdiction upon appellate review of those orders. Therefore, reading Section 16-115B... Is that provision still on the books? Yes, it is, Your Honor. Section 16-115B refers to Article 10 and that is still in the books. Well, I'm talking about the provision that you just referred to, Article 10. Article 10 is. Section 5-10-201A has not been invalidated? Well, no, it has not. So Article 10-201 states that the Commission shall have jurisdiction and states the procedure and even states that it has the ability and authority to promulgate orders granting Rape Relief. I thought that provision was struck down by the courts as an improper interference with appellate jurisdiction? No, Your Honor. That's still in existence and looking at that in conjunction with that, Section 16-115B gives jurisdiction. Again, though, even looking at Section 9-252... That's not what the Kreutzer case holds? No, the Kreutzer case was limiting it to a narrow holding as far as we're concerned and what we would submit to this Court and shouldn't apply here. Why is that? Because here, the ICC specifically states that Section 16-115B shall have Commission jurisdiction in accordance with Article 10, so it's still in Section 16-115B referring all to the provisions of Article 10. The entire procedure of Article 10, not just 201, sets forth the procedure of the ICC to promulgate all of these orders, not just specifically 10-201. And appellate review is direct to the circuit courts? To this Court as well as the Illinois Appellate Court. Well, not directly to this Court. Correct. To the circuit court for appellate review only. But looking at 9-252... And that's still valid? That's still valid. Okay. Looking at Section 9-252, though, even that section applies here because the ICC requires to hear complaints about reasonableness of charges and rates of service. And again, looking at the inclusionary language of the Rate Relief Act, specifically 16-101, it allows a section to apply when dealing with tariff services. What's most notably important here is that the Chiku case specifically determined that an ARES is an electric public utility when it's providing the exact same services. And when the ICC, an administrative body that is designed to regulate and is enforced by the Public Utilities Act, when it interprets its statute and its powers, it should not be disturbed unless patently false. And we submit that it's not here. So the ICC in Chiku states that an ARES, engaging utility services, is by definition a public utility, which is what Zahn is contending does not apply here and does not give rate relief under Section 9-252. So either way, Section 16-115B or 9-252 apply here, and Zahn readily concedes that 9-252 gives jurisdiction exclusively. So since we're dealing with tariff services being provided by NAPG, which is the exact same services that a public utility would provide, Section 9-252 should apply based on the inclusionary language of 16-101. Most importantly, this is not really a case of first impression here since the SRT Enterprises versus Direct Energy ruled on this issue consistently with our position here today. In that case, the district court, the Northern District of Illinois, ruled that an ARES belonged to the ICC exclusively when the dispute was as to whether or not it was a claim for reparations. Instead of appealing directly to this court, the plaintiff there chose to go back to state court, lost at the trial court level, and then appealed to the Illinois appellate court. There the Illinois appellate court made the exact same analysis as the Northern District of Illinois did in stating that the Section 16-115B applies to give exclusive jurisdiction to a dispute involving an ARES when it is a claim for reparations. But that's not binding on this court. It's not binding, but it's persuasive, Your Honor. And there's no other decision that Zahn can cite that would be as impactful as here as to some other courts that have ruled within this court's purview. So we would suggest it's a lot more persuasive than some of the gratuitous citations that Zahn cites in other outlier districts dealing only with the 12B6 portion of the motion to dismiss and not dealing with the jurisdictional challenge. And the Chiku case also affirmed the holding in SRT Enterprises by stating itself that the ICC, after reviewing all of the statutory schemes here and the legislative intent, has exclusive jurisdiction to hear this dispute. Well, did Chiku say exclusive or just accept jurisdiction of the case? Technically, it just said it accepted jurisdiction of the case. Well, that's kind of an important technicality. It is. And as you said, Your Honor, the implication was after that motion to dismiss filed by the ARES, when the ICC said that it had jurisdiction, it was implied that it was going to be sent forth for determination as to whether or not a customer would be entitled to rate relief. What happened after that decision? After that, there's no other record of it. The ICC technically has two different ways they hear complaints. One is an informal complaint process where a customer just lodges a complaint. At that point, the ICC can reach out to an ARES or public utility to see if they can negotiate a resolution. If a resolution can't be reached, then a formal complaint can be filed, and at that point, the ICC can make a ruling or, again, try to negotiate a resolution. Right, but there must be some record of the disposition of that complaint. We don't. We don't know if the issue was resolved or what the case could have been. How can that be? It's a public agency. You don't do this in secret. There's nothing after that, so I don't know if it was resolved or not, Your Honor. Is it still pending? I'm sorry? Is it still pending? I do not believe so. If you want, we can look and double-check to make sure that is and submit a 28-J letter if needed on that issue. Just curiosity. But the ICC does have the ability, unlike what Zahn contends, to issue orders granting or denying relief. My client, who is here today, actually has to appear before the ICC tomorrow, ironically, for a customer who is claiming they are entitled to rate relief. There have been many procedures where the ICC has governed, as we've stated in the briefs, giving the ICC the ability to order a rate relief or refund to a customer who has a valid meritorious claim. And because of these interpretations within this court's purview, it stands to reason that the ICC would want to regulate this entire process of chain. By way of background a little bit, an ARES is nothing more than working in tandem with the public utility, since the public utility has the long infrastructure of lines that are used to deliver the electricity once it's purchased from an ARES or any other provider. So therefore, an ARES and a public utility work in tandem. So it stands to reason the ICC would want to regulate this entire process and not have to regulate one entity over the other. Just because the ICC regulates these entities differently does not mean one is less regulated than the other. And as Your Honor mentioned, deregulation simply refers to the enactment of the Rate Relief Act, allowing more choice and competition for Illinois customers to choose their own electricity service provider instead of relying on the local monopoly. Well, but it is deregulatory in the sense that this sector is no longer subject to the rate-making authority of the Commission. So rate setting is independent of the regulatory authority. Your argument, as I understand it, is that enforcement of contractual rates is up to the ICC exclusively with appeal to the circuit courts. Correct. Correct. Because Section 16-115B lists the requirements that it has jurisdiction over, specifically whether or not there was an adequate disclosure here of the prices in terms of service by an ARES to its customer, that's exactly what we're talking about here. And that gives jurisdiction to the ICC. When ComEd files its tariff rate, it doesn't have oversight by the ICC. They file the rate as they see fit, and they do it for a long portion of time. It's at that point that the ICC says, okay, that's the rate that's going to be a binding contract between it and the customer. The ICC, on the other hand, with an ARES, sets forth a long list of requirements that's more stringent than what the public utility does. The public utility just files its rate on its own free will. And as Zahn is contending here... Right, but subject to approval of the Commission. They have the ability to... They can accept it or send it back, right? True, but ComEd is the one who comes up with that rate, and that's it. But Section 9-252, regardless, applies here if someone is claiming that they were charged too much, because 9-252 applies with the inclusionary language of the Rate Relief Act. And as we've said before, the tariff services here is the same thing, whether it's provided by NAPG or an ARES. And we submit to this court that that's what NAPG was doing. And as the ICC has held in Chico, when an ARES is providing utility services, it shall be defined as a public utility under Section 3-105, which is what Zahn is complaining excludes 9-252. So the ICC held and confirms that an ARES is by definition a public utility. So 9-252 applies in that context, as well as the inclusionary rate of 16-101 that allows this section to apply when dealing with tariff services. And that is nothing more than what Zahn was asking for, was for electricity service, no matter who was providing it, whether it was NAPG or ComEd, it would have been the exact same service. The Skilling and Wernickehoff case that Zahn cites, the Skilling case is very limited in narrow, in a narrow ruling here. The Skilling case was dealing with a completely different statutory scheme, and that was a workers' compensation issue. And that court didn't hold that the ICC did not have exclusive jurisdiction at all. It just simply stated that the ICC did not have jurisdiction when dealing with matters of law. In that context, the plaintiff was challenging an insurance coverage dispute on a workers' compensation issue. Because it was an insurance coverage dispute, the court held that the ICC did not have jurisdiction because it was a matter of law. And matters of fact as to whether or not someone was entitled to workers' compensation benefits would still belong with the ICC exclusively. The ABF Fretz case that we cite in our brief distinguishes this fact and gave jurisdiction to the ICC in that same context when dealing with a matter of fact. That's exactly what we're referring to here when dealing with a claim for reparations and a claim for civil damages. Most of the cases cited by Zahn regarding telecommunication industry were civil damages because there the plaintiffs were alleging that some other wrongful conduct occurred, not that the charges were unreasonable. The heart of the matter is Zahn believes he was charged too much for the electricity service provided. And when it is a claim for reparations, the jurisdiction belongs with the ICC. And that is what has been held by the case law within this court's purview as well as the ICC holding in Chico. Even looking beyond the jurisdictional issue, the district court went above and beyond in stating that the 12B6 motion to dismiss was granted because no cause of action could have survived. Regardless of how Zahn tries to classify her claim, whether it's an Illinois Consumer Fraud Act claim, breach of contract, unjust enrichment, the heart of the matter is that she believes she was charged too much. The district court aptly noted that the contract language was clear on its face, and when the contract language is clear and contradicts with the allegations, the language of the contract controls. The variable rate set forth factors, some of which were not market-dependent, as Zahn alleges. Even assuming, arguendo, that Zahn was correct and that this should have been a variable rate according to the market, what Zahn is trying to do now is state that the rate was in direct contradiction to the local utility. But that's not what they're alleging. They're alleging that this should have been consistent with the market. And the graph that's attached to the complaint and relied upon by the district court shows that the intercontinental exchange market, which is the market, directly flowed in some correlation to NAPG's rates. And there was no guarantee in the contract that there would be a one-to-one basis here. And most importantly, the district court noted that there was no oppressive scheme, because Zahn could have canceled their contract at any time. There was no cancellation fee, no termination fee, nothing that would have prevented Zahn from stopping her service and going to a local utility or to another ARES. Therefore, the district court noted that no breach of contract, no unjust enrichment claim could survive. In conclusion, your honors, either section, whether it's 9-252 or 16-115B, applies here and invokes the exclusive jurisdiction of the ICC, which is supported by the clear language of the statutory scheme, case law within this court's purview, as well as the legislative intent of the Public Utilities Act. The district court did not err and should be affirmed here for these reasons, along with the clear language of the contract proving that Zahn has no right to relief. Thank you. Thank you, Mr. Kappas. Mr. Blankenship. May it please the court, I'd like to briefly address the 12B6 issue and simply point out that three other district courts have, before we finished briefing, had addressed the virtually identical contract under other states' virtually identical consumer protection laws and under contract law. And they all found that plaintiff stated a claim. That was Edwards regarding Connecticut, Fritz regarding New Jersey, and Clurge regarding New York. Since then, a fourth court has weighed in against North American Power's motion to dismiss. That was Tully versus North American Power. That's Judge Edgington. That was issued after we had completed our briefing. I have a copy of that case for the court, if it finds appropriate. In any event, if the court finds that the district court properly ruled on the 12B6, and we would suggest they did not, then the appropriate decision would be to remand the case to the district court to give us an opportunity to amend the complaint. The court never addressed that issue because it dismissed it on jurisdictional grounds and under Rule 15, and innumerable cases leave to amend should be freely granted. I guess I would also just like to point out that the complaint does explicitly allege that there is a significant disconnect between the intercontinental rate, the wholesale rate, and North American Power's rate. For example, and we say this on pages 25 and 26 of our initial brief, there's a three-month period in the end of 2012 to the beginning of 2013 where utility rates drop, while North More egregiously, there's a five-month period in 2013 where wholesale rates dropped 17%, while North American Power's rates rose 7%. So I would suggest that the complaint is more than adequate in pleading that there's a plausible claim for relief. And in addition, North American Power promised that Ms. Zahn's first-month rate would be 0.049 cents, and they charged 0.059 cents. That's an explicit deception that goes to the heart of what her rates are, and that renders plausible her claim that she was deceived as to what her rate was. I would like to, defendant seems, back on jurisdictional question, defendant seems to concede that the only place to find exclusive jurisdiction for rate relief would be in Section 9-252. But 9-252 only applies to public utilities. In both the Rate Relief Law and the Public Utilities Act, after the Rate Relief Law was adopted, the legislature explicitly provided that Ares is not a public utility. There could not be a more clear expression of legislative intent than 9-252 did not apply. And it bears noting that the legislature did identify other parts of the Public Utility Act that did apply. They failed to do so here, and the court would be required to apply that. I see that I'm out of time. Unless the court has other questions, I thank the court for its attention. Thank you, counsel. Thanks to both counsel. The case will be taken under advisement.